UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
---------------------------------------------------------X
KOON CHUN HING KEE SOY & SAUCE
FACTORY, LTD.,

                Plaintiff,

        -against-

KUN FUNG USA TRADING CO. INC., et al.,

                Defendants.
---------------------------------------------------------X

REPORT &
RECOMMENDATION
07-CV-2568 (JG)

Gold, S., *United States Magistrate Judge*:

## INTRODUCTION

Plaintiff, Koon Chun Hing Kee Soy & Sauce Factory, Ltd., brings this action under the

Lanham Act, 15 U.S.C. §§ 1051 *et seq.*, for trademark and trade dress infringement, alleging that

defendants manufacture, import, sell, and distribute counterfeit goods bearing plaintiff's

trademarks.   Upon plaintiff's application and in light of certain defendants' failure to appear in or

otherwise defend this action, the Clerk of the Court entered the default of the following

defendants: Kun Fung USA Trading Co., Inc., Cheung Fat Trading Inc., Gung Fat Trading Inc.,

Metropolitan Group USA Inc., and Chun Wai Chak.[1]   Docket Entry 56.

Plaintiff now moves for a default judgment against four of the defaulting defendants: Kun

Fung USA Trading Co., Inc., Cheung Fat Trading Inc., Gung Fat Trading Inc., and Chun Wai

Chak (hereinafter, "defendants").[2]   The Honorable John Gleeson referred plaintiff's motion to me

for a report and recommendation.   *See* Order dated Sept. 24, 2010.

---

[1] Defendant Chak was initially represented by counsel and participated in the proceedings through counsel.   At a
conference held on November 8, 2007, I extended defendants' time to answer to November 19, 2007, but Chak never
filed an answer.   Accordingly, upon plaintiff's application, the Clerk entered Chak's default on January 23, 2008.
On March 9, 2009 the Honorable Charles P. Sifton granted Chak's counsel's motion to be relieved.
[2] Two other defendants, Sonic Group, Inc. and Wong Fat Market Inc., defaulted after they initially appeared in the
action.   Docket Entry 134.   Upon plaintiff's application, Docket Entry 169, Sonic and Wong Fat have since been
dismissed from the action.   Order dated 12/8/11.   In addition, Metropolitan Group, one of the other defaulting

Individual defaulting defendant Chak, along with unknown individuals and settling defendants Li, Huang, and Wong, are alleged to be the "principal[s] and/or owner[s]" of Kun Fung, Cheung Fat, and/or Gung Fat. Compl. ¶¶ 8, 9, 11, 13, 15, 16. Upon further investigation, plaintiff discovered that Gung Fat is not a registered corporation but is most likely an alias of Cheung Fat and/or Chak. Chan Decl. ¶ 52 (describing how Cheung Fat may be the Cantonese pronunciation for the Chinese name Gung Fat).[3] Because it appears that Gung Fat lacks the legal capacity to be sued, I respectfully recommend that Gung Fat be dismissed from this action. *See Duval v. Midwest Auto City, Inc.*, 425 F. Supp. 1381, 1387 (D. Neb. 1977), *quoted in Care Envtl. Corp. v. M2 Techs., Inc.*, 2006 WL 148913, at *6 (E.D.N.Y. Jan. 18, 2006) (stating that "[d]oing business under another name does not create [a separate] entity"). I address plaintiff's motion with respect to the remaining defendants below.

## BACKGROUND

Koon Chun is a Hong Kong company that manufactures and distributes sauces, seasonings and vinegars. Compl. ¶¶ 1, 21. Koon Chun owns a U.S.-registered trademark, "Koon Chun Sauce Factory," that it uses on its products. *Id*. ¶ 22. In addition, Koon Chun employs a "distinctive label design" on its goods, comprised of "a distinctive script font with red lettering and a yellow border in association with blue trapezoidal shapes with a yellow background and a pink circular seal bearing a green and blue ancient Chinese wine glass" (plaintiff's "trade dress"). *Id*. ¶ 23. Plaintiff has used its trademark since 1927 and the trade dress described for at least ten years. *Id*. ¶ 25. Koon Chun contends that it has expended great expense and effort to promote its

---

defendants and a corporation that dissolved prior to the filing of this lawsuit, was also dismissed upon plaintiff's application. *Id.*
[3] "Chan Decl." refers to the Declaration of Raymond Chan, dated April 8, 2011, Docket Entry 159.

trademark and trade dress and that its goods are widely recognized and enjoy a reputation for quality. *Id.* ¶¶ 26, 30.

In 2007, as a result of information developed in another lawsuit, plaintiff discovered that Tung Ming Trading, Inc. was supplying counterfeit Koon Chun products to its customers. *Id.* ¶¶ 33, 34. Upon further investigation, plaintiff learned that the defendants in this action were supplying Tung Ming with the counterfeit goods. *Id.* ¶ 37. Based on this information, plaintiff alleges that all of the defendants were selling counterfeit Koon Chun products to retailers and wholesalers. *Id.* ¶ 38. Relevant to the pending motion, Tung Ming's records indicated that it received counterfeit Koon Chun products from Kun Fung, which operated at 950 4th Avenue, Brooklyn. Yu Decl. ¶¶ 2-16, Docket Entry 156. According to Tung Ming's manager, the person he dealt with at Kun Fung was defendant Chun Wai Chak. *Id.* ¶ 14. In addition, Koon Chun received information from one of its authorized distributors that, upon investigation, led plaintiff to believe that Gung Fat, an entity associated with both Cheung Fat and Kun Fung, was selling counterfeit products. Chan Decl. ¶¶ 51-56. Koon Chun contends that defendants' counterfeit goods infringe on its trademark and trade dress and are likely to cause confusion as to the true source of the goods. Compl. ¶ 41.

## DISCUSSION

*I.    Liability*

Once found to be in default, a defendant is deemed to have admitted all of the well-pleaded allegations in the complaint pertaining to liability. *See Greyhound Exhibitgroup, Inc., v. E.L.U.L. Realty Corp.*, 973 F.2d 155, 158 (2d Cir. 1992), *cert. denied*, 506 U.S. 1080, 113 S. Ct. 1049 (1993); *Montcalm Publ'g Corp. v. Ryan*, 807 F. Supp. 975, 977 (S.D.N.Y. 1992). A court, however, retains the discretion to determine whether a final default judgment is appropriate.

*Enron Oil Corp. v. Diakuhara*, 10 F.3d 90, 95 (2d Cir. 1993). Even after a defendant has defaulted, "[a] plaintiff must ... establish that on the law it is entitled to the relief it seeks, given the facts as established by the default." *U.S. v. Ponte*, 246 F. Supp. 2d 74, 76 (D. Me. 2003) (citation omitted). *See also Au Bon Pain Corp. v. Artect, Inc.*, 653 F.2d 61, 65 (2d Cir. 1981) (recognizing the court's authority, even after default, to determine whether plaintiff has stated a cause of action).

Plaintiff brings claims under the Lanham Act for trademark infringement, 15 U.S.C. § 1114(1)(a), and false designation of origin, § 1125(a)(1)(A).

To prevail on a claim of trademark infringement, "plaintiffs need only show that they own a valid trademark and that the defendants' use of the trademark is likely to cause confusion regarding the source of the product." *Tanning Research Labs., Inc. v. Worldwide Imp. & Exp. Corp.*, 803 F. Supp. 606, 608-09 (E.D.N.Y. 1992); *see also* 15 U.S.C. § 1114(1)(a) (prohibiting the unauthorized use of "any reproduction, counterfeit, copy, or colorable imitation of a registered mark in connection with the sale, offering for sale, distribution, or advertising of any goods or services on or in connection with which such use is likely to cause confusion, or to cause mistake, or to deceive"). Plaintiff owns a federally registered trademark and thus has satisfied the first of these two elements. Compl. ¶ 22. I address the likelihood of confusion below.

To prevail on a claim of false designation of origin, plaintiff must establish that 1) the trade dress is distinctive; 2) there is a likelihood of confusion between the parties' products; and 3) the trade dress is not functional. 15 U.S.C. § 1125(a)(3); *Wal-Mart Stores, Inc. v. Samara Bros., Inc.*, 529 U.S. 205, 210 (2000); *Yurman Design, Inc. v. PAJ, Inc.*, 262 F.3d 101, 115 (2d Cir. 2001); *Montblanc-Simplo GmbH v. Colibri Corp.*, 692 F. Supp. 2d 245, 254 (E.D.N.Y. 2010). "In a claim based on product packaging trade dress, the distinctiveness requirement can be met in one of

two ways – either by establishing that the dress is inherently distinctive because it clearly identifies the source of the product, or by establishing that the dress has acquired secondary meaning because, in the mind of the general public, the 'primary significance' of the dress is to identify the source of the product." *Eliya, Inc. v. Kohl's Dep't Stores*, 2006 WL 2645196, at *2 (S.D.N.Y. Sept. 13, 2006) (citing *Wal-Mart Stores*, 529 U.S. at 215); *see also Yurman Design*, 262 F.3d at 115.

> In determining whether a particular trade dress is inherently distinctive,

> > courts apply the generic, descriptive, fanciful, and arbitrary classifications used for assessing trademarks. However, because manufacturers and retailers have a "virtually unlimited" choice of packaging and labeling materials available to them, most packaging trade dress is arbitrary, fanciful, or suggestive. If the overall dress is arbitrary, fanciful, or suggestive, it is inherently distinctive despite its incorporation of generic or descriptive elements.

*Gross v. Bare Escentuals Beauty, Inc.*, 641 F. Supp. 2d 175, 193 (S.D.N.Y. 2008) (internal quotation marks and citations omitted). *See also Tecnimed SRL v. Kidz-Med, Inc.*, 763 F. Supp. 2d 395, 405 (S.D.N.Y. 2011) (citing *Paddington Corp. v. Attiki Imps. & Distribs., Inc.,* 996 F.2d 577, 582-83 (2d Cir. 1993)).

Plaintiff's trade dress is comprised of a distinctive red script with a yellow border and "blue trapezoidal shapes with a yellow background and a pink circular seal bearing a green and blue ancient Chinese wine glass." Compl. ¶ 23. There is no functional or descriptive purpose served by this particular packaging. Accordingly, I find that plaintiffs' trade dress is arbitrary and distinctive and that it therefore qualifies for protection. *See Koon Chun Hing Kee Soy & Sauce Factory, Ltd. v. Murray Int'l Trading Co., Inc.*, 2008 WL 1771920, at *1 (E.D.N.Y. Apr. 15, 2008) (noting that plaintiff's trade dress is distinctive when granting plaintiff a preliminary injunction for trademark and trade dress infringement).

5

As noted above, an essential element of both a trademark infringement claim and a false designation claim is a demonstration of likelihood of confusion. In assessing the likelihood of confusion,

> the Court must consider the factors established in *Polaroid Corp. v. Polarad Elecs. Corp.*, 287 F.2d 492, 495 (2d Cir. 1961): (1) strength of the plaintiffs' mark; (2) degree of similarity between the two marks; (3) proximity of the products in the marketplace; (4) likelihood that the plaintiff will enter a market related to that in which the defendant sells its product; (5) evidence of actual confusion; (6) defendant's bad faith; (7) quality of the defendant's product; and (8) sophistication of the relevant consumer group.

*Guishan*, 2008 WL 4276579, at *2.

In a case of counterfeiting, however, a court need not undertake an exhaustive analysis of the *Polaroid* factors because

> confusing the customer is the whole purpose of creating counterfeit goods. Thus, the Court need only determine the more fundamental question of whether there are items to be confused in the first place – that is, whether the items at issue here are, in fact, counterfeit and whether Defendants sold those items.

*Gucci Am., Inc. v. Duty Free Apparel, Ltd.*, 286 F. Supp. 2d 284, 287 (S.D.N.Y. 2003).

Plaintiff has established that the counterfeit Koon Chun products in this case were passed off as genuine. As plaintiff contends, the labels on the genuine and counterfeit cans are "virtually indistinguishable." *See* Chan Decl. ¶ 34. The similarity is so great that it can be explained only as the result of intentional copying. Moreover, plaintiff has offered proof of actual confusion and of the poor quality of defendants' products. The owner of Tung Ming and the owner of a local retailer both believed that they were purchasing genuine Koon Chun sauces when they were in fact purchasing counterfeit products. Yu Decl. ¶¶ 7-10; Chan Decl. ¶ 51 (describing how a customer of one of plaintiff's authorized distributors returned Koon Chun products, complaining that the "taste and color of the product were not correct;" the products were later determined to be

counterfeit goods).

In addition, plaintiff has established that defendants were the source of the counterfeit Koon Chun goods. Plaintiff's investigation, based on a review of Tung Ming's books and records, revealed that Kun Fung sold the counterfeit products to Tung Ming. Yu Decl. ¶¶ 2-16. In addition, the general manager of Murray International Co., Inc., a defendant in a separate action, has submitted a declaration reporting that Murray purchased counterfeit Koon Chun goods from Kun Fung, believing them to be genuine. Chin Decl. ¶¶ 7, 9, Docket Entry 158. In addition, Kun Fung made at least one purchase from Koon Chun that plaintiff contends is suspicious because Kun Fung ordered only one case or box of each of five of Koon Chun's products, conduct suggestive of a plan to examine and copy the products and packaging rather than to acquire quantities consistent with legitimate commercial activities. Chan Decl. ¶ 101 & Sealed Ex. 4 at 9.

Plaintiff has also sufficiently established Chak's individual liability. Ya Ling Yu, the owner of Tung Ming, and Buckly Chin, the owner of Murray, specifically identified Chak as the individual who arranged some of their purchases of counterfeit goods through Kun Fung. Yu Decl. ¶ 14; Chin Decl. ¶¶ 16, 17, 20. Moreover, Chak's computer, which Chin provided to plaintiff, contained Kun Fung invoices and business records. Chan Decl. ¶¶ 70, 192-96, 208-33. Finally, during plaintiff's seizure of counterfeit goods at the address for Kun Fung, the owner of the building identified a room as Chak's bedroom, and documents linking Chak to Kun Fung were found there.[4] Chan Decl. ¶¶ 81, 85

Finally, with the assistance of one its customers, Queens Wins Produce Inc. ("Wins"),

---

[4] New York State Department of State, Division of Corporations, lists Chun Wai Chak as a principal of Kun Fung, which is an inactive corporation, dissolved as of October 27, 2010. *See* *http://www.dos.state.ny.us/corps/bus_entity_search.html* (searchable database of registered corporations). Nonetheless, as I noted in my prior Order, Docket Entry 164, a dissolved corporation may be sued while it is winding down its affairs.

plaintiff learned that Gung Fat/Cheung Fat was also supplying counterfeit Koon Chun products. Chan Decl. ¶ 52 & Exs. 13, 19, 65. The Cheung Fat invoices, Exhibit 65, are sufficient to establish its liability for sales of counterfeit Koon Chun goods.

Plaintiff, however, has not clearly established Chak's involvement with Cheung Fat. Although the business records of Cheung Fat were on Chak's computer, Chak lent his computer to at least one other individual, Buckley Chin, so the presence of Cheung Fat's business records on the computer is not sufficient to establish Chak's liability for Cheung Fat. Cheung Fat's corporate registration identifies Shu Fong Wong as the incorporator and principal of Cheung Fat.[5] Chan Decl. Ex. 31. *See also* Sealed Ex. 5 (identifying Wong as president and secretary of Cheung Fat and Chak as "authorized signor" on a Cheung Fat bank account and corporate resolution). In addition, Wins' owner identified "Ah Yuen," who was later identified as defendant Yuan Xi Li, as the individual who arranged the sale of counterfeit goods through Gung Fat to Wins. Win's owner also provided a telephone number he used to place the order with Gung Fat, and this number was traced to Xue Mei Huang, Li's Husband. Chan Decl. ¶¶ 52, 53, 61. For these reasons, I respectfully recommend that Chak not be held jointly and severally liable for the damages plaintiff establishes are due to Cheung Fat's infringement.

In short, plaintiffs have established defendants' liability for trademark and trade dress infringement under §§ 1114(1)(a) and 1125(a)(1)(A). I now turn to plaintiff's demand for injunctive relief, damages, and attorney's fees and costs.

## II.     *Injunctive Relief*

The Lanham Act provides for injunctive relief "according to the principles of equity and

---

[5] Chan also discovered a share holder agreement for Cheung Fat on Chak's computer. Chan Decl. ¶¶ 92, 93. Although the agreement indicates that Chak owned a 40% share of Cheung Fat, Chan Decl. Ex. 32, the agreement is unsigned and therefore offers little evidence of Chak's actual involvement with Cheung Fat.

upon such terms as the court may deem reasonable to prevent the violation of . . . [the Act.]"  15

U.S.C. § 1116(a).   A plaintiff seeking a permanent injunction must demonstrate: 1) irreparable

injury, 2) absence of an adequate remedy at law, such as monetary damages, 3) that the balance of

hardships tips in favor of the plaintiff, and 4) that the public interest would not be disserved by an

injunction.   *See eBay Inc. v. Mercexchange, L.L.C.*, 547 U.S. 388, 391 (2006); *Salinger v.

Colting*, 607 F.3d 68, 79-81 (2d Cir. 2010).

In trademark cases, irreparable injury is established where there is a likelihood of

confusion.   *Prot. One Alarm Monitoring, Inc. v. Exec. Prot. One Sec. Serv., LLC.*, 553 F. Supp. 2d

201, 206 (E.D.N.Y. 2008) (internal quotation marks omitted); *see also Guishan, Inc. v. Scooby

Scraps, Inc.*, 2008 WL 4276579, at *2 (E.D.N.Y. Sept. 16, 2008).   As discussed above, given the

intentional counterfeiting by defendants, the ordinary consumer is likely to be, and was in fact,

confused as to the source of defendants' products.

As a result of defendants' infringement, plaintiff stands to lose its accumulated good will

and reputation for quality – losses that are not easily remedied by monetary damages.   *See Essie

Cosmetics v. Dae Do Int'l, Ltd.*, 808 F. Supp. 952, 957 (E.D.N.Y. 1992).   Without injunctive

relief, defendants would likely continue their infringement, which would continue to erode the

market for genuine Koon Chun products and undermine the brand recognition of plaintiff's mark

and trade dress.   I therefore find that plaintiff has made the requisite showing of irreparable harm.

Finally, the public has "an interest in not being deceived   . . . [and] being assured that the

mark it associates with a product is not attached to goods of unknown origin and quality."   *New

York City Triathlon, LLC v. NYC Triathlon Club, Inc.*, 704 F. Supp. 2d 305, 344 (S.D.N.Y. 2010).

This prong is therefore satisfied as well.

As noted previously, however, the corporate entities are no longer active corporations.

*See* http://www.dos.state.ny.us/corps/bus_entity_search.html. Kun Fung was dissolved in 2010 and Cheung Fat is listed as inactive, without any date of dissolution indicated.[6] *Id*. Moreover, plaintiff has not submitted any evidence of sales by these defendants after 2007. *See* Chan Decl. Exs. 65, 71, 79. Plaintiff contends that defendants' infringement likely continues because it seized counterfeit goods from other entities *after* it seized goods at defendants' warehouses in July, 2007. Pl. Mem. 5 (citing a seizure at Excelsior, a downstream purchaser of Kun Fung's goods, on August 14, 2007 and a seizure at Combo Trading on October 1, 2007).[7] However, in a declaration submitted by plaintiff, Excelsior's president states that he purchased Koon Chun products from Murray in 2006 through June, 2007, and that Excelsior sold Koon Chun products to Combo during the same time frame, so these counterfeit sales occurred *prior* to the seizures at defendants' warehouses. Lam Decl. ¶¶ 8, 9, Docket Entry 157. Thus, plaintiff has failed to establish a likelihood of continued infringement by Kun Fung and Cheung Fat and I respectfully recommend that injunctive relief against these corporate entities be denied.

Chak is a different story. Because of his default, plaintiff has been unable to take any discovery from him about his current affiliations with any corporations or business entities or his commercial activities generally. Thus, Chak has precluded plaintiff from learning whether he remains involved in counterfeiting. I therefore respectfully recommend that defendant Chak be enjoined from using plaintiff's mark or trade dress, or any colorable imitation or confusingly similar design, in connection with the distribution of Koon Chun goods by himself or any corporate entities whose activities he may control.

---

[6] A search of the cited database reveals that there are two corporations with the name Cheung Fat, but only one has an address on Fourth Avenue in Brooklyn, tied to plaintiff's allegations and proof in this case.
[7] "Pl. Mem." refers to the Memorandum of Law in Support of Plaintiff's Motion for Default Judgment, Docket Entry 154-3.

III.     Damages

Although the allegations of a complaint pertaining to liability are deemed admitted upon entry of a default judgment, allegations relating to damages are not.   *See Greyhound Exhibitgroup*, 973 F.2d at 158.   Rather, claims for damages generally must be established in an evidentiary proceeding at which the defendant is afforded the opportunity to contest the amount claimed.   *Id*.   A court must ensure that there is a basis for the damages sought by a plaintiff before entering judgment in the amount demanded.   *See Fustok v. ContiCommodity Servs., Inc.*, 873 F.2d 38, 40 (2d Cir. 1989).   A court may make this determination based upon evidence presented at a hearing or upon a review of detailed affidavits and documentary evidence.   *See* FED. R. CIV. P. 55(b)(2); *Action S.A. v. Marc Rich & Co., Inc.*, 951 F.2d 504, 508 (2d Cir. 1991); *Fustok*, 873 F.2d at 40.

Defendants did not submit any opposition to plaintiff's motion.   Nevertheless, on December 21, 2011, I held an inquest hearing on plaintiff's application for damages.   Despite notice of the hearing, Docket Entry 175, no defendants appeared at the inquest.

A plaintiff in a trademark or trade dress infringement case may elect to recover either actual or statutory damages.   15 U.S.C. § 1117.   A plaintiff who elects to recover actual damages, as Koon Chun has here, is entitled to recover "(1) defendant's profits, (2) any damages sustained by the plaintiff, and (3) the costs of the action," subject to the principles of equity.   § 1117(a).   If plaintiff further establishes that defendants intentionally used plaintiff's trademark to sell counterfeit Koon Chun sauce, the court "*shall*, unless the court finds extenuating circumstances, enter judgment for three times [defendants'] profits or [plaintiff's] damages, whichever amount is greater, together with a reasonable attorney's fee."   § 1117(b) (emphasis added).

11

*A. Defendants' Profits*

Plaintiff seeks to recover defendants' profits, trebled in light of defendants' willfulness. Pl. Mem. 6-9.   In determining a defendant's profit, the Lanham Act provides that "the plaintiff shall be required to prove defendant's sales only; defendant must prove all elements of cost or deduction claimed."   15 U.S.C. § 1117(a).   Nonetheless, "[i]f the court shall find that the amount of the recovery based on profits is either inadequate or excessive the court may in its discretion enter judgment for such sum as the court shall find to be just, according to the circumstances of the case.   Such sum . . . shall constitute compensation and not a penalty."   *Id.*

Plaintiff seeks a total of $332,365.03 in damages based on defaulting defendants' profits. Pl. Mem. 7; Corrected Chan Decl. ¶ 265.   Plaintiff's calculations reflect defendants' gross revenues, as plaintiff contends that defendants bear the burden of establishing their costs.   Pl. Mem. 6-7.   Plaintiff's specific calculations are that defendant Cheung Fat sold $3,236.50 of counterfeit Koon Chun goods and Kun Fung sold $329,470.95 of counterfeit Koon Chun products. Chan Decl. ¶¶ 238-41.   Plaintiff then subtracts the value of the counterfeit goods seized at Kun Fung, which amounts to $342.42.   Corrected Chan Decl. ¶ 265, Docket Entry 178-1 (sealed).

As the statute indicates, plaintiff bears the burden of establishing defendants' sales only. Courts have held that a defendant in default who does not participate in inquest proceedings fails to carry its burden of establishing its costs and that a plaintiff may thus be awarded a defendant's gross revenue from sales.   *See, e.g., BeautyBank, Inc. v. Harvey Prince LLP*, 2011 WL 671749, at *5 & n.3 (S.D.N.Y. Feb. 24, 2011) (declining to deduct defendant's apparent costs from its sales, despite the fact that Sales Reports indicated some costs); *Chloe v. Zarafshan*, 2009 WL 2956827, at *6 (S.D.N.Y. Sept. 15, 2009) (awarding plaintiffs more than $2.4 million based on defendants' receipts of sales proceeds and noting that "[s]ince defendant chose to default and has not appeared

12

in this proceeding, he has necessarily failed to carry his burden to demonstrate deductible expenses"). Accordingly, although the inventory reports contain some information about defendants' costs, I decline to consider it here because defendants have defaulted and failed to participate in the inquest proceedings.

Plaintiff has calculated its best estimate of defendants' revenues from their sale of counterfeit Koon Chun products based on a review of Chak's computer records by Raymond Chan, Koon Chun's Regional Manager – Americas. Chan Decl. ¶¶ 2, 192-243. Chan reviewed the business records of various entities on the computer, including databases containing Cheung Fat's and Kun Fung's records. Chan was able to run various reports of the data in the computer, including Inventory and Sales Reports for each corporate defendant.

In the Cheung Fat and Kun Fung databases, Chan observed that Koon Chun products were given item codes 10161 through 10307 on Stock Price Lists.[8] Chan Decl. ¶¶ 201, 209. He also discerned that the same products had two different codes. For example, "Thin soy sauce 6 x 60 fl. oz. can ctn." was listed with item codes 10161 and 10225. *Id*. Chan then printed the Cheung Fat invoices for Wins. Chan Decl. ¶ 203 & Ex. 65. The invoices indicate that the counterfeit Koon Chun products sold to Wins had code numbers 10163 through 10195. Chan Decl. Ex. 65. Furthermore, certain Kun Fung vendor invoices correspond to Koon Chun's records of Kun Fung's purchase of its legitimate goods, and these invoices use codes 10203 through 10225 for the various genuine Koon Chun products. Chan Decl. Sealed Exs. 13, 14. Chan inferred from these invoices that item codes 10161 through 10195 in the databases represented counterfeit Koon Chun products. Chan Decl. ¶¶ 205, 213. I find Chan's reasoning and logic in identifying the

---

[8] Chan found three databases containing Kun Fung inventory. Chan Decl. ¶ 208.

counterfeit Koon Chun goods in the database to be a reasonable method of establishing defendants' sales of counterfeit goods.

Chan printed sales and inventory reports for products with codes 10161 through 10195 from the various Cheung Fat and Kun Fung databases. He cross-checked the sales reports with invoices in each of the databases to ensure there was no duplication. Chan Decl. ¶¶ 207, 219, 227. Chan also credited Kun Fung for $8,574.60 in returns that were noted in the computer but not reflected in the sales reports. Chan Decl. ¶ 225. With the exception of the Kun Fung database KF-2007A and the $24,668.50 in inventory reflected in that database that plaintiff seeks as damages, I find Chan's method of establishing defendants' sales to be reasonable.

In database KF-2007A, Chan found no evidence of sales of counterfeit Koon Chun products in the Inventory Transaction Report. Chan Decl. ¶ 229 & Ex. 81. The Report indicates a "Balance Brought Forward" of more than 1,200 cases or boxes of counterfeit Koon Chun products. Chan Decl. ¶ 230 & Ex. 81. Chan then speculates that these goods, which he values at $24,668.50, "must have been hidden" in a second, unknown warehouse of Kun Fung and "could have been sold" at some point in time. Chan Decl. ¶ 233. Because the "sales" plaintiff identifies in the KF-2007A database are speculative, I recommend that they not be included in the computation of plaintiff's damages.[9]

From the two Kun Fung databases, Chan calculates that Kun Fung's sales of counterfeit Koon Chun products total $138,017.05 and $166,783.40 ($175,358 minus $8,574.60 for returned goods), less $342.42 for the seized goods.[10] Chan Decl. ¶¶ 218, 225 & Exs. 71, 79, 80; Corrected

---

[9] I further note that Buckley Chin had possession of the computer and provided it to plaintiff. Thus, Chak did not have an opportunity to delete any damaging information concerning sales on the computer.

[10] There is an error in the arithmetic in the Chan Declaration. Plaintiff calculates the total from the second database, after subtracting the returned goods, as $166,785.40. Chan Decl. ¶ 225. The court calculates that this total ($175,358 - $8,574.60) should be $166,783.40.

Chan Decl. ¶ 265.   Chan calculates that Cheung Fat's sales of counterfeit goods, based on invoices and a Sales Report in the Cheung Fat database, total $3,236.50.   Chan Decl. ¶¶ 206-207 & Ex. 66.   I have reviewed Chan's calculations and they appear correct.   Accordingly, I find that defendants' revenues from sales of counterfeit products are $3,236.50 for Cheung Fat and $304,458.03 ($138,017.05 + $166,783.40 - $342.42) for Kun Fung and Chak.

*B. Set-Off*

As noted above, plaintiff settled its claims with certain defendants, including individual defendants Li, Huang, and Wong.   Docket Entries 138, 140.   I therefore consider whether the settlement amounts recovered by plaintiff should be set off against defendants' sales revenues when calculating plaintiff's damages.

"[F]ederal common law governs whether a defendant in an action brought under federal law is 'entitled to a credit against judgment for the settlement by another party to the dispute.'" *Chloe*, 2009 WL 2956827, at *7 (quoting *Singer v. Olympia Brewing Co.*, 878 F.2d 596, 599 (2d Cir. 1989)).   Although federal law permits a defendant's liability to be reduced based on its proportionate share of liability where a jointly liable co-defendant has settled, *McDermott v. AmClyde*, 511 U.S. 202, 221 (1994), there appears to be a split of authority over whether a defendant in default is entitled to any set-off.   At least one court within this Circuit has held that a defendant in default "may not invoke the benefits of the set-off rule."   *Chloe*, 2009 WL 2956827, at *7.   *See also RLI Ins. Co. v. King Sha Grp.*, 598 F. Supp. 2d 438, 446-47 (S.D.N.Y. 2009) (finding that, under New York law, a defaulting defendant is not entitled to any set-off based on a co-defendant's settlement).   However, other courts, sometimes without discussing the issue, have found that a set-off is appropriate and reduced a plaintiff's award against a defaulting defendant by the amount of a settlement.   *See*, *e.g.*, *Cooper v. Faith Shipping*, 2009 WL 1789405, at *6-8 (E.D.

La. June 22, 2009) (citing *McDermott* and noting that, because of the default, "there will be no apportionment of fault" from which to determine each defendant's proportionate share of damages, but nevertheless reducing defaulting defendant's liability by the amount of the settlement); *see also Allstate Ins. Co. v. Palterovich*, 653 F. Supp. 2d 1306, 1325 (S.D. Fla. 2009) (reducing a RICO default judgment by the amount of the settlements but without discussion of the set-off issue); *State Farm Mut. Auto. Ins. Co. v. Kalika*, 2007 WL 4326920, at *9 (E.D.N.Y. Dec. 7, 2007) (same).

Although the Supreme Court stated in *McDermott* that it is "generally agreed that when a plaintiff settles with one of several joint tortfeasors, the nonsettling defendants are entitled to a credit for that settlement," the Court also found that nothing prohibits a plaintiff from recovering more than his actual losses.   *McDermott*, 511 U.S. at 208, 219.   Indeed, the Court stated, "[t]he law contains no rigid rule against overcompensation.   Several doctrines . . .   recognize that making tortfeasors pay for the damage they cause can be more important than preventing overcompensation."   *Id*. at 219.

In light of the circumstances here, I recommend a set-off.   First, plaintiff contends that the individual settling defendants and Chak were involved together in selling counterfeit Koon Chun goods through the various corporate entities.   Compl. ¶¶ 8, 9, 11, 13.   Second, I have given plaintiff a benefit by declining to deduct defendants' apparent costs as identified in Inventory Reports, and instead recommending that plaintiff be awarded defendants' gross revenues.   Third, the statute provides that a court should exercise its discretion in making a "just" award and permits a court to adjust an award when it deems the amount "excessive."   15 U.S.C. § 1117(a).   For all these reasons, I recommend that the defaulting defendants not be held liable for the amount that

plaintiff has already recovered from other defendants.[11]   Accordingly, I respectfully recommend

that the defaulting defendants' liability be reduced by $24,000, the total amount of the settlements.

*See* Sealed Ex. 24.   I further recommend that the set-off be applied in amounts that are

proportionate to the liability of each defendant, and I calculate that Cheung Fat's proportionate

share of liability is 1%.[12]   Thus Cheung Fat's liability is reduced to $2,996.50 ($3,236.50 - $240)

and the liability of Kun Fung and Chak is reduced to $280,698.03 ($304,458.03 - $23,760).

   *C.  Willfulness*

   As noted above, trebling of defendants' profits is mandatory if the court finds that

defendants' actions were willful, absent extenuating circumstances.   15 U.S.C. § 1117(b).

   In its complaint, plaintiff alleges that defendants "deliberately employ a mark identical to

Plaintiff's Koon Chun Trademark and Trade Dress to mislead and confuse customers into

believing that defendants' goods are provided, sponsored, or approved" by plaintiff.   Compl. ¶ 42.

As stated in another trademark default action, "[b]y virtue of their default, defendants have

admitted plaintiffs' allegation that they acted knowingly and intentionally or with reckless

disregard or willful blindness to plaintiffs' rights."   *Lyons P'ship, L.P. v. D & L Amusement &*

*Entm't, Inc.*, 702 F. Supp. 2d 104, 117 (E.D.N.Y. 2010).   *See also Victoria Cruises, Inc. v.*

*Changjiang Cruise Overseas Travel Co.*, 630 F. Supp. 2d 255, 261 (E.D.N.Y. 2008) ("A

defendant's default may be considered as evidence of willful infringement.").   Moreover, the

---

[11]  Plaintiff also contends that Chak was responsible for the sale of counterfeit goods to defendants in other civil actions in which it has received settlement amounts.   I do not consider those settlements in reducing the amount of the defaulting defendants' liability here.   The defendants in the other actions, such as Buckley Chin and Murray International Trading Co., Tony Lam and Excelsior Trading Company, and Ya Ling Yu and Tung Ming, were downstream purchasers of defendants' counterfeit goods.   In contrast, the settling defendants in this action are alleged to have been Chak's co-conspirators and, together with Chak, principals of the corporate defendants, including Kun Fung and Cheung Fat.   Compl. ¶¶ 8, 9, 11, 13.   *See also* Exs. 53, 54 (Wong's signature on a Kun Fung wire transfer and corporate check); Sealed Ex. 5 (identifying Chak and Wong as signatories on a bank account for Kun Fung and as the Board members of Kun Fung on a Kun Fung corporate resolution).

[12]  3,236.50 divided by the sum of 280,458.03+3,236.50 equals .01, or 1%.

evidence here supports a finding that defendants' infringement was willful and intentional, as defendants attempted to pass off counterfeit Koon Chun goods to individuals who believed they were purchasing genuine Koon Chun products. Thus, I respectfully recommend that the award of profits be trebled and that plaintiff be awarded $8,989.50 against Cheung Fat and $842,094.09 against Chak and Kun Fung.

D. *Interest*

Plaintiff seeks pre- and post-judgment interest on the award of damages and attorney's fees.[13] Upon a finding of willfulness, the Lanham Act provides that

> the court may award prejudgment interest on [a plaintiff's damages award] at an annual interest rate established under section 6621(a)(2) of Title 26, beginning on the date of the service of the claimant's pleadings setting forth the claim for such entry of judgment and ending on the date such entry is made, or for such shorter time as the court considers appropriate.

15 U.S.C. § 1117(b). Accordingly, an award of prejudgment interest under the Lanham Act is discretionary. I recommend an award of prejudgment interest on the $8,989.50 against Cheung Fat and $842,094.09 against Chak and Kun Fung in damages as requested by plaintiff. Pl. Mem. 20. Plaintiff indicates that the § 6621 interest rate ranged from 3% to 8% during the relevant time period. Pl. Supp. Mem. 13, Docket Entry 167-7. I find an interest rate at the midpoint, or 5.5% per annum, to be reasonable to compensate plaintiff. I therefore recommend that plaintiff be awarded prejudgment interest on the $8,989.50 against Cheung Fat and $842,094.09 against Chak and Kun Fung in damages at the rate of 5.5% per annum from July 24, 2007, the date the complaints were served on these defendants, through the date of judgment, to be calculated by the Clerk of the Court. Roccanova Decl. Ex. B.[14]

---

[13] Pursuant to 28 U.S.C. § 1961(a), a prevailing party, such as plaintiff here, is entitled to post-judgment interest "on any money judgment in a civil case recovered in a district court."

[14] "Roccanova Decl." refers to the Declaration of Joseph T. Roccanova, dated April 8, 2011, Docket Entry 155.

As discussed below, plaintiff will be adequately compensated for its attorney's fees and costs without an award of pre-judgment interest and I therefore recommend not awarding interest on these amounts. *See Sherwood Brands of R.I., Inc. v. Smith Enters., Inc.*, 2003 WL 22061871, at *2 (D.R.I. March 31, 2003) (citing cases for the proposition that prejudgment interest on attorney's fees is not the norm).

### E. Attorney's Fees and Costs

Under the Lanham Act, "the court in exceptional cases may award reasonable attorney fees to the prevailing party." 15 U.S.C. § 1117(a). Exceptional circumstances include willful infringement, and thus a "finding of willfulness determines the right to attorneys' fees." *Bambu Sales, Inc. v. Ozak Trading Inc.*, 58 F.3d 849, 854 (2d Cir. 1995); *see also Nike, Inc. v. Top Brand Co.*, 2006 WL 2946472, at *3 (S.D.N.Y Feb. 27, 2006). Moreover, § 1117(b) states that reasonable attorney's fees are mandatory upon a finding of intentional infringement. As discussed above, I find that defendants' actions were willful and intentional, and an award of attorney's fees is therefore mandatory.

In the Second Circuit, courts determine a "presumptively reasonable fee" award by calculating the product of the hours reasonably expended and a reasonable hourly rate. *Arbor Hill Concerned Citizens Neighborhood Ass'n v. County of Albany*, 522 F.3d 182, 183-84 (2d Cir. 2008). A reasonable rate should be calculated by considering what a reasonable, paying client would be willing to pay, taking into account, among other things, the complexity and difficulty of the case and the resources required to prosecute it effectively. *Id.* Generally, fee awards should be based on rates charged by attorneys employed in the district where the court sits. *Simmons v. New York City Trans. Auth.*, 575 F.3d 170, 172 (2d Cir. 2009). A party may overcome the

---

"Roccanova 12/7/11 Decl." refers to the Declaration of Joseph T. Roccanova in further support of plaintiff's motion, Docket Entry 176.

presumption in favor of rates charged by counsel in the forum district only by establishing "that a reasonable client would have selected out-of-district counsel because doing so would likely (not just possibly) produce a substantially better net result." *Id*. at 175. All requests for attorney's fees in this Circuit must be accompanied by contemporaneous time records that show "for each attorney, the date, the hours expended, and the nature of the work done." *New York State Ass'n for Retarded Children, Inc. v. Carey*, 711 F.2d 1136, 1148 (2d Cir. 1983). *See also Scott v. City of New York*, 643 F.3d 56, 58-59 (2d Cir. 2011).

Plaintiff seeks $648,722.41 in fees and costs. Roccanova 12/7/11 Decl. ¶ 3(h), Docket Entry 178. This amount includes not only the fees charged for prosecuting this action but also the fees charged for prosecuting several other civil actions on the grounds that Chak was the moving force behind the counterfeiting alleged in all of them. Pl. Supp. Mem. 7-8. More specifically, plaintiff seeks a fee award that includes the following amounts: $35,195.68 for prosecuting its action against Midwest Global in a district court in Illinois; $22,081.81 for prosecuting its action against Tung Ming, 07-CV-1444 (JFB) (E.D.N.Y.); $148,993.47 for prosecuting its action against Excelsior, 07-CV-3224 (CPS) (E.D.N.Y.); $98,490.65 for prosecuting its action against Murray, 07-CV-3781 (CPS) (E.D.N.Y.); $28,389.71 for prosecuting its action against Combo, 07-CV-3880 (CPS) (E.D.N.Y.); and $346,571.09 for prosecuting the within action, less $31,000 in bond payments. Roccanova Decl. ¶¶ 31-36; Sealed Ex. 26.

Plaintiff candidly acknowledges that there is no legal support for an award of fees incurred litigating other cases, but contends that this case presents an extraordinary circumstance warranting such an award. I conclude that an award of fees that includes attorney's fees and costs incurred while prosecuting other actions is inappropriate. In those actions, plaintiff had the opportunity to recover its fees through any settlement or judgment it obtained. Moreover, Chak

and the defaulting corporate entities should not be charged for any dilatory or litigious tactics undertaken, if they occurred at all, by unrelated defendants. I therefore respectfully recommend that plaintiff's application for fees and costs incurred litigating other actions be denied.

As noted above, in prosecuting this action alone, plaintiff seeks $269,970.83 in attorney's fees and $38,655.15 in costs for a total of $308,625.98 for litigation through April 5, 2011. Roccanova Decl. ¶ 36. The fees sought as of April 5, 2011 reflect a total of approximately 1,086.87 hours of "professional service," which include both attorney and paralegal time, although the number of paralegal hours appears to be de minimis.[15] Sealed Ex. 22, Docket Entry 162. Plaintiff also seeks an additional $20,500 in attorney's fees and $1,855.94 in costs spent on the within default motion through September 6, 2011, Sealed Ex. 23, and $15,450 in fees and $139.17 in costs for the period through November, 2011, Sealed Ex. 25. In sum, plaintiff now seeks a total of $346,571.09, comprised of $305,920.83 in attorney's fees and $40,650.26 in costs through November, 2011.[16] As discussed above with respect to the set-off, I recommend that Cheung Fat's liability for fees and costs be proportional to its share of damages.

### 1. Hourly Rates Charged by Plaintiff's Counsel

Plaintiff seeks reimbursement for the time spent by these individuals at the following hourly rates: Roccanova, currently a partner with 22 years of experience, $250; Yuen, an attorney of counsel who is fluent in Chinese, $250; and various paralegals, $125.[17] Roccanova Decl. ¶ 29 & Sealed Ex. 22. Plaintiff's counsel states that these billing rates are actually low for trademark

---

[15] This number was calculated by adding the "professional service" hours for each month of time records submitted in Sealed Exhibit 22. Multiplying these hours by the rate of $250 for attorneys results in a total of $271,717.50, a difference in approximately $2,000 from the amount plaintiff seeks, which suggests that the "professional service" hours attributed to paralegals is a very small percentage. A summary review of the time records also reveals very few paralegal hours.

[16] Plaintiff's attorney's billing records for this action can be found in Sealed Exhibits 22, 23, and 25.

[17] Counsel also bills time for work performed by other attorney associates at the hourly rate of $250.

litigation and notes that I previously approved higher rates sought by Koon Chun, represented by different counsel, in a separate action.   Roccanova Decl. ¶¶ 39, 40.

Recent cases awarding fees in the Eastern District of New York indicate that the hourly rates sought by plaintiff's counsel are within the spectrum for this district.   *See, e.g., Melnick v. Press*, 2009 WL 2824586, at *9 (E.D.N.Y. Aug. 28, 2009) (collecting recent Eastern District cases and finding that, "the range of appropriate billing rates is $200-$375 per hour for partners and $100-$295 per hour for associates"); *Trs. of the Local 813 I.B.T. Ins. Trust Fund v. Amanda Carting Corp.*, 2007 WL 4324019, at *6 (E.D.N.Y. Dec. 7, 2007) (noting that recent hourly rates approved in the Eastern District range from $200 to $375 for partners, $200 to $250 for senior associates, $100 to $150 for junior associates, and $70 to $80 for paralegals); *Expeditors Int'l of Wash. Inc. v. Rubie's Costume Co.*, 2007 WL 430096, at *2 (E.D.N.Y. Feb. 2, 2007) (approving an hourly rate of $340-$370 for an attorney with 25 years of litigation experience, although noting that it was on the high side).   Accordingly, I approve the hourly rates sought by plaintiff's counsel as reasonable.

## 2.   Time Expended

The time expended in this action is quite substantial – more than one thousand hours. Although there were numerous defendants in this action, and although the case progressed over several years and was complicated by numerous court hearings on various issues early in the proceedings, I find that the time expended by counsel is still excessive.   In particular, plaintiff's Regional Manager for Americas, Raymond Chan, was highly involved in the litigation and many hours were billed for time spent communicating with Chan.   Moreover, plaintiff's counsel's billing records reveal that substantial time was spent prosecuting this action against defendants who appeared and not specifically against the defaulting defendants.

a. *Excessive Billing Generally*

As noted, counsel billed nearly eleven hundred hours in this case alone. Although this case was quite complex procedurally and a substantial number of hours were required to prosecute it, there are numerous instances of excessive billing.

For example, counsel billed more than one hundred hours before this action was even filed. Although a certain amount of investigation and legal work was undoubtedly necessary prior to filing the complaint, the amount of time billed here is unwarranted, especially in light of the fact that plaintiff filed an action two months earlier, with a nearly identical complaint, and most likely nearly identical documents in support of its order for seizure. *See Koon Chun Hing Kee Soy & Sauce Factory, Ltd. v. Tung Ming Trading, Inc.*, 07-CV-1444 (JFB). Although plaintiff's counsel states that the billing in this action is pro-rated insofar as the time expended applied to more than one case, Roccanova Decl. ¶ 38, none of these initial hours were pro-rated. *See* Billing Entries dated 05/2-30/07. Accordingly, I find that a significant reduction is warranted. *See Entral Grp. Int'l v. Sun Sports Bar Inc.*, 2007 WL 2891419, at *11 (E.D.N.Y. Sept. 28, 2009) (reducing a fee award by 40% after finding that 132 hours spent on drafting a complaint and similar motions in a copyright infringement action was excessive, especially in light of the "routine" nature of the case and pointing out that the complaint was "strikingly similar" to others filed by the same plaintiff).

Another instance of excessive billing is reflected in the presence of three attorneys, each billing nine hours, for the execution of seizure warrants by the United States Marshal on July 24, 2007.[18] Moreover, counsel billed for time expended on activities that it appears a paralegal could have handled. *See*, *e.g.*, Billing Entries dated 6/12/07 ("E-mail communication to Raymond Chan

---

[18] It appears that counsel erroneously included approximately ten hours for which the firm already billed in a bill spanning several months. *Compare* Docket Entry 162-23 at 15-17 *with id*. at 20-22 (reflecting duplicative billing entries dated 6/25-28/07).

regarding color version of catalog for use as exhibit to his Declaration"); 7/2-3/07 ("Fax communication to Raymond Chan regarding Court's decision"); 7/12/07 (.90 hours billed for serving the U.S. attorney); 8/2/07 (1.3 hours billed for traveling to/from courthouse to obtain transcript); 3/12-13/09 (6.7 hours billed for "[r]eview[ing]/analyz[ing] AT&T records . . . and preparation of chart analysis").   In addition, counsel billed at the attorney rate for ECF filing. *See*, *e.g.*, Billing Entries dated 9/25/07; 11/21/07; 1/9/08; 5/13 & 14/08; 1/26/10; 4/12-14/11; 5/13/09; 8/28/09.   A reduction in fees is warranted where counsel bills for administrative work that could have been handled by a paralegal at a lower hourly rate.   *Top Banana, L.L.C. v. Dom's Wholesale & Retail Ctr., Inc.*, 2008 WL 4925020, at *2 (S.D.N.Y. Nov. 10, 2008) (recognizing that the "magistrate judge properly reduced the presumptive fee award amount . . . to take into account attorney hours billed for the performance of paralegal-type work"); *Staples, Inc. v. W.J.R. Assocs.*, 2007 WL 2572175, at *8 (E.D.N.Y. Sept. 4, 2007).

### b.   Billing Related to Co-Defendants

Plaintiff also seeks attorney's fees for time spent litigating the action against non-defaulting defendants.   Courts are reluctant to require a non-settling defendant to bear the full burden of attorney's fees where co-defendants have settled.   *See*, *e.g.*, *Refractory Serv. Co. v. Shaw Refectories*, 2007 WL 118780, at *4–5 (N.D. Ind. Jan. 9, 2007); *Sugarman v. Vill. of Chester*, 213 F. Supp. 2d 304, 312–13 (S.D.N.Y. 2002).   Holding defaulting defendants liable for the entirety of the fees incurred in a litigation, or a disproportionate amount of fees, would permit some defendants to settle their case at a discount while requiring the defaulting defendants to subsidize the difference.   *See Sugarman*, 213 F. Supp. 2d at 313.   Such an apportionment overlooks the fact that plaintiff should, and likely did, factor its attorney's fees into the settlements it reached with certain defendants.   *See Refractory Serv. Co.*, 2007 WL 118780, at *5.

An example of time spent prosecuting this case against other defendants is the 58.2 hours billed for April through July, 2009 devoted to a motion by defendant Wong's attorney to withdraw and the preparation of a pretrial order involving the non-defaulting defendants. Plaintiff also expended many hours taking depositions of the settling defendants and discovery related to them. *See* Billing Entries dated 08/24/07 and 4/7-8/08 (17.7 hours billed for deposition of Wong); 1/18-30/08, 2/1-6/08, 2/12/08 (billing related to Li and Huang discovery); 2/13-15/08, 3/11/08, 3/14/08 (billing related to Wong); 4/4/08 (Li deposition); 4/21-22 & 30/08; 5/21/08 (discovery related to Wong and his restaurant partners); 6/4/08 (document inspection related to Wong); 1/8-20/09 (preparation for meeting with Li/Huang attorney). In June, 2008, counsel billed extensive hours related to Wong, including time spent attending document production and inspection and subsequent communications concerning deficiencies, as well as time spent bringing a new attorney hired by Wong up to speed. Also, in the first half of 2010, more than forty hours are billed for work that appears for the most part to relate solely to non-defaulting defendants. To the extent that plaintiff's claims against the defaulting defendants are intertwined with its claims against the settling and non-defaulting defendants, Pl. Supp. Mem. 9-10, a reduction is still warranted. Plaintiff could have factored its fees related to the settling defendants into the amounts it sought when settling with those individuals and corporate entities.

### c. *Excessive Billing for Client Communications*

Perhaps the most striking aspect of counsel's billing is the amount of time charged for communicating with Raymond Chan, plaintiff's Regional Manager. Although a plaintiff is entitled to, and should, participate in its own litigation, the involvement of Chan and communications between counsel and Chan go beyond what is reasonable, especially when a party asks a court to order its adversary to pay its attorney's fees. For example, in December, 2008,

approximately one-third of the billed hours (3.3 of the 9.6 total), although a nominal amount in and of itself, was spent communicating with Chan, and in particular concerning "scanning and Bates numbering" of telephone records. *Cf. Brown v. Patelco Credit Union*, 2011 WL 4375865, at *6 (N.D. Ill. Sept. 20, 2011) (finding that "3.2 hours of attorney-client communication over a ten-month period" was not excessive). The following month, counsel billed over eighteen hours (of a total of twenty-four hours billed that month) communicating with Chan concerning settlement of the action with co-defendants. *See also* Billing Entry dated 6/3/08 (two entries for "Meeting with Raymond Chan regarding case strategy, further evidence needed to prove and maximize damages, evidence linking Chak, Wong and Li, . . ., settlement strategy, further investigation needed, etc."). In June, 2008, plaintiff billed 7.9 hours for communications with Chan, including, for example, .4 hours spent "[r]eview[ing]/analyz[ing] past investigation reports . . . regarding telephone numbers searched." The defaulting defendants should not be responsible for paying these fees.

Moreover, much of the time was spent simply updating plaintiff on the status of the case. Although this was reasonable as a general proposition, the amount sought is excessive, particularly in light of the fact that multiple e-mails and telephone conferences occur on the same day or consecutive days. *See*, *e.g.*, Billing Entries dated 8/27/07 (1 hour billed for "Review[ing] 7 emails from Raymond Chan" and two separate billing entries for "Telephone conversation[s]"); 9/11/07 ("Telephone conversation . . . regarding our motion to direct U.S. Marshal to file appropriate proof of service"); 11/7/07 (multiple communications "regarding case status"); 11/21/07 (multiple communications regarding status); 1/14-18/08; 7/13-15/09 (communications regarding status of pre-trial order). *See also* Billing Entries dated 4/19/07-7/3/07 (communications by Po Yuen, an attorney, with Chan with no description of the purpose of the

communication); 4/28/11 ("Telephone conversation with Raymond Chan regarding affidavits of service filed for our default judgment motion").   In addition, some of the hours communicating with Chan appear to have been devoted to Chan's own suggestions about drafting legal documents. *See*, *e.g.*, Billing Entries dated 6/11-20/07, 6/20/08, 6/23/08, 5/1/09.   *See also* Billing Entries dated 3/12-15/10 (.8 hours billed trying to add Chan to the court's ECF system).   For all these reasons, a reduction is warranted.   *Smith v. Ashcroft*, 2005 WL 1309149, at *5 (W.D. Mich. May 25, 2005) ("While a certain amount of consultation with one's client is certainly necessary, courts have not hesitated to reduce fee requests when the hours sought by a plaintiff's counsel for such consultations are plainly excessive.").

### 3.  Court's Calculation of a Reasonable Fee

For all of these reasons, a significant reduction in the amount of fees sought by plaintiff is appropriate.   I conclude that the billing issues described above support an across-the-board 30% reduction.   *See Carey*, 711 F.2d at 1146 (recognizing that judge "was acting within his discretion when he chose to make percentage reductions in response to defendants' detailed claims that fee application contained excessive and duplicative hours"); *Fleurentin v. McDowell*, 2009 WL 2969686, at *13-14 (E.D.N.Y. Sept. 16, 2009) (reducing a fee award by 30% where hours included time spent prosecuting the action against other defendants and other claims).   Therefore, I recommend that plaintiff's fee request of $305,920.83 be reduced by 30% to $214,144.58.   As discussed earlier, Cheung Fat's share of this fee is $2,141.45; Chak's and Kun Fung's share is $212,003.13.

*F.  Costs*

In addition to their fees, plaintiff seeks to recover $40,650.26 in costs related to prosecuting

this action.[19]   Roccanova Decl. ¶ 36; Sealed Exs. 22, 23, 25.   The costs for which plaintiff seeks

reimbursement run the gamut from the mundane, such as nominal subway travel, postage, and

copying, to larger fees for transcripts, subpoenas, interpreters, service of process, and

investigators.   *See, e.g.*, Billing Entries dated 11/6/07, 1/14/08, 4/4/08, 4/23-30/08, 5/20-30/08,

6/17-26/08, 7/2-8/08.   All of these costs are of the sort reasonably billed to paying clients.   *See*

*Arbor Hill Concerned Citizens Neighborhood Ass'n v. Cnty. of Albany*, 369 F.3d 91, 98 (2d Cir.

2004) (citing *Case v. Unified Sch. Dist. No. 233*, 157 F.3d 1243, 1257-58 (10th Cir. 1998)

("Reasonable expenses incurred in representing a client . . . should be included in the attorney's fee

award if such expenses are usually billed in addition to the attorney's hourly rate."); *Chanel, Inc. v.*

*Gardner*, 2011 WL 204911, at *6 (S.D.N.Y. Jan. 21, 2011) (recognizing that "[i]nvestigative fees

may also be recoverable as expenses in trademark-infringement cases under the Lanham Act, if

shown to be necessary and accompanied by proper documentation" but declining to award such

fees where plaintiff offered only a "bald assertion of necessity").

Many of the costs sought here, though, relate directly to litigation against a non-defaulting

defendant.   *See, e.g.*, Billing Entries dated 2/12-13/08 (service and copying costs related to

non-defaulting defendants' discovery); 4/4/08 ("Interpreter's fee re: hearing" at E.D.N.Y.

concerning Wong's discovery obligations and "Interpreter's fee for [Li] deposition"); 5/19/08

("Subpoena fees to Shu Fong Wong's employees"); 5/20/08 ("Interpreter's fee re: deposition of

Shu Fong Wong"); 7/8/08 ("Interpreter's fee for deposition of [settling defendant] Shu Fong

---

[19] Plaintiff also sought to recoup costs incurred in the other civil litigations.   For the same reasons I recommend
denying the attorney's fees for time expended prosecuting other cases, I recommend denial of these costs.

Wong"); 7/14/08 ("Interpreter's fee re: [Li] deposition").[20]  In other instances, it would seem the cost should be spread amongst the defendants.  *See*, *e.g.*, Billing Entries dated 4/23/08 (subpoena fees); 5/27/08 (same); 4/30/08 (transcripts of Li and Wong depositions); 6/17-26/08; 7/21-22/08 (deposition transcripts of Li and Wong); 8/5/08 (more than $1,000 billed for "Documents produced by Verizon").  Accordingly, I respectfully recommend that plaintiff's application for costs similarly be reduced by 30% from $40,650.26 to $28,455.18.  Cheung Fat's liability is apportioned to be $284.55; Chak's and Kun Fung's is $28,170.63.

## CONCLUSION

For the reasons discussed above, I respectfully make the following recommendations:

1) that judgment be entered against Cheung Fat for $11,415.50, comprised of $8,989.50 in damages, $2,141.45 in attorney's fees and $284.55 in costs,

2) that judgment be entered against Chak and Kun Fung, jointly and severally, for $1,082,267.85, comprised of $842,094.09 in damages, $212,003.13 in attorney's fees and $28,170.63 in costs,

3) that plaintiff be awarded prejudgment interest on the $8,989.50 against Cheung Fat and $842,094.09 against Chak and Kun Fung at the rate of 5.5%, beginning from July 24, 2007, to be calculated by the Clerk of the Court at the time of judgment,

4) that plaintiff be granted a permanent injunction against defendant Chak only, and

5) that plaintiff's claims against defendant Gung Fat be dismissed.

These amounts are based on my recommendations that a) a set-off for the amount received in settlements with co-defendants be applied to these defendants' liability, b) defendants acted wilfully and thus the awards of defendants' profits are trebled, c) plaintiff's application for attorney's fees litigating other actions be denied, d) plaintiff's application for interest on its

---

[20] Counsel bills $400 on 5/30/08 for "Interpreter's fee re: deposition on 4/29/08," but counsel's billing records do not indicate that any deposition occurred on that day.  *See* Billing Entry dated 4/29/08.

attorney's fees and costs be denied, and e) Cheung Fat be held liable for fees and costs based on its 1% share of the total damages award.

Any objections to this Report and Recommendation must be filed within fourteen days of this Report and in any event no later than February 6, 2012. Failure to file objections within the specified time may waive the right to appeal the District Court's order. *See* 28 U.S.C. § 636(b)(1); FED. R. CIV. P. 72; *Small v. Sec'y of Health & Human Servs.*, 892 F.2d 15, 16 (2d Cir. 1989). Plaintiff is hereby directed to serve copies of this Report and Recommendation upon defaulting defendants at their last known addresses, and to file proof of service with the Court.

_____/s/_____
**STEVEN M. GOLD**
**United States Magistrate Judge**

Dated:      Brooklyn, New York
            January 20, 2012

*U:\eoc 2012\koon chun\r&r final.docx*